IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AUTOZONE, INC., et al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>MICHAEL STRICK et al. )<br>)<br>Defendants. ) | Case No.:   03 C 8152<br><br>Judge Darrah |

### DEFENDANTS' CLOSING ARGUMENT

This is a case about Mike and Paula Strick and how they built their business from the ground up. They built a business around two shops which brought them a measure of success, a future and a way to provide for their children. How did AUTOZONE treat them? According to AUTOZONE's own counsel in charge of its trademark enforcement program, the Stricks were merely an afterthought that "slipped through the cracks." What does that say about how seriously AUTOZONE perceived any real threat that Michael Strick's mark posed?

We are asking the Court to rely on its common sense as it applies the evidence to the law of this circuit. Examining all the testimony of the witnesses and the exhibits shows both that the doctrine of *laches* bars AUTOZONE's claims and that consumers would not likely be confused as to the source or affiliation of the parties' marks. With regard to *laches*, AUTOZONE has no legally valid excuse for its over four year delay before notifying Michael Strick of its objection to his use of OIL ZONE. During that time frame, Michael Strick spent well over $29,000 in advertising costs and significant time and effort growing his business and establishing good will and patronage in his community. To deprive him of the fruits of those efforts simply because AUTOZONE misplaced his case for over four years frustrates the very notions of equity and the underpinnings of *laches*.

Similarly, within the context of the seven factor likelihood of confusion balancing test, the

evidence overwhelmingly weighs in favor of Michael Strick.  While AUTOZONE is indisputably a strong mark, the other six factors weigh in favor of Mr. Strick - including the three more heavily weighted factors of actual confusion, intent and similarity of the marks.  In its closing, AUTOZONE, of course, ignores most of the relevant testimony and documents introduced at trial and instead simply regurgitates axiomatic principals of trademark law.  Indeed, AUTOXONE resurrects the old trial adage, "When the facts are against you, focus on the law."  This misdirection is no more transparent than in AUTOZONE's robotic repetition of its defense to *laches*:  AUTOZONE had the other trademark challenges, so *laches* does not apply.  This, of course, ignores the requirement that AUTOZONE act diligently with its trademark enforcement program: a failure in this case that eliminates AUTOZONE's claim.  In the end, the facts and law support the Stricks.  AUTOZONE has the burden of proof in this case, and it failed to meet it.

> I.   *The doctrine of laches precludes AUTOZONE's claims.*

The doctrine of *laches* is equitable in nature and derived from the maxim that those who sleep on their rights lose their rights. *Chattanooga Manufacturing, Inc. v. Nike, Inc*., 140 F.Supp. 917, 930 (N.D. Ill. 2001).  The defense of *laches* may operate to bar all claims for injunctive and monetary relief. *See id*. at 930 & 932-933.  To prove *laches*, Michael Strick must demonstrate: (1) an unreasonable lack of diligence on the part of AutoZone; and (2) prejudice arising therefrom. *See id. citing Hot Wax, Inc. v. Turtle Wax, Inc*., 191 F.3d 813, 827 (7th Cir. 1999).  The application of the *laches* defense is discretionary, and the Court should look at all of the facts and circumstances of the case and weigh the equities involved. *Id*. at 930.

AUTOZONE's diligence, by its own admission, was non-existent and its reason inexcusable.  AUTOZONE's delay was explained by nothing more than a case that "slipped through the cracks".  AUTOZONE learned of Michael Strick's shops in late 1998 when Kirby & Associates, an Illinois

private investigation firm, investigated and photographed the OIL ZONE shop and faxed a report to AUTOZONE. (Stip. Nos. 34-35) However, AUTOZONE waited four years and two months until February 2003 before objecting to Michael Strick's use of OIL ZONE – a simple two page form cease and desist letter. (Stip. No. 36) Another ten months elapsed before AUTOZONE filed suit. AUTOZONE's only rationale for this over four year delay is that it allegedly "prioritized" Michael Strick's use of the marks OIL ZONE and WASH ZONE and apparently did not believe that his marks merited any attention while it pursued action against others.

AUTOZONE's "reason" for its delay had been represented in detail to the Court in countless pleadings and motions. On November 3, 2008, that reason completely unraveled when Amy Clunan proved it nothing more than a ruse. She first explained the nature, extent and importance of AUTOZONE's trademark enforcement program. Critically, at her counsel's urging on direct examination, she explained that she carefully examined every challenged use (including Michael Strick's) in 1999 and assigned each a priority. She then flagged each for re-review every 3, 6 or 12 months. She made it crystal clear that she personally reviewed every file - - a necessary component of the foundation that was required for AUTOZONE's defense to *laches*. The following excerpts explain:

> MR. COOPER: No, she wasn't involved at the beginning. I think I can bring out by her testimony that she became involved subsequently and was involved in that decision-making process as it moved forward during that time period. (Tr. 173)
> ***
> MR. COOPER: All right. She made what I believe was a preliminary evaluation and a preliminary decision.
>
> THE COURT: As to each and every case?
>
> MR. COOPER: As to each and every case, yes, which ones to take on, in which order, and that decision was approved. (Tr. 178)
> ***
> THE COURT: I'm sorry. Did you begin making the initial recommendations for all trademark infringement actions involving your company in the United States in 1999?

3

THE WITNESS:   Yes, sir. (Tr. 185).

During cross-examination, however, Ms. Clunan admitted that she was never aware of Michael Strick's use until late 2002. (Tr. 219-220, 228-229).  She never reviewed - much less prioritized - his use in 1999 or at any other time prior to December 2002 during her role as <u>the primary trademark enforcement review attorney for AUTOZONE</u>.  As a final insult to the intelligence of the Court, after affirming that her review of the marks necessarily included a careful study of the investigator's report, she ultimately admitted that she did not even see the Kirby report on OIL ZONE until the day before her deposition in 2005.  The following excerpts explain:

Mr. Zehe:   Okay. And do you know what decision was made regarding that prioritization?

Witness:   Yes. It was to put it in line to be re-reviewed at another date because  - -

Mr. Zehe:   What date?

Witness:   I believe we looked at it about 12 months down the road; the next winter we looked at it.

Mr. Zehe:   You're sure it's 12 months down the road, that's the prioritization that was given?

Witness:   I could not be 100 percent sure, no.

Mr. Zehe:   But it'was one of those, 12 months, 14 months?
Witness:   We usually do it in three, six and 12-month increments, depending on the case.

Mr. Zehe:   Okay. So you're saying –

Witness:   '4 months, no.

Mr. Zehe:   You're saying now that it's at least six months or months it was given prioritization, right?

Witness:   No. It was given -- it would come – for review again.

Mr. Zehe:   In either the six or 12-month slot, right?

Witness:   Yes. (Tr. 228-229)

Giving credence to the axiom, "the devil is in the details," her further testimony revealed that in fact no one at AUTOZONE looked at Mr. Strick's use for nearly four years until late 2002:

Mr. Zehe: Did you review it in 1999?

Witness: I did not.

Mr. Zehe: Did you have anything to do with the decision not to proceed with -- to either proceed or not proceed with it in 1998 or 1999?

Witness: No.

Mr. Zehe: . . . you had no personal knowledge, isn't it a fact, Ms. Clunan, about the Stricks' case in either 1998, 1999, 2000, 2001 and 2002? Right?

Witness: I believe I became aware of the case in November or December of 2002.

Mr. Zehe: So the first time you ever became aware personally of the Stricks' case, the Oil Zone, AutoZone, was in November, December of 2002?

Witness: Correct, yes. (Tr. 233)

***

Mr. Zehe: In 2003, Ms. Clunan - - I'm sorry, 2002, it was Pete Aiken that brought to your attention that there was a use of Oil Zone and Wash Zone in Illinois, right?

Witness: Pete Aiken, yes.

Mr. Zehe: Right. Before that you had no idea about Oil Zone and Wash Zone, correct?
Witness: No.

Mr. Zehe: Correct, you had no idea?

Witness: That is correct.

Mr. Zehe: So if I understand your testimony, prior to December 2003 your system of periodically checking the alphabetized folders and your system of Shaw Pittman advising you of the six and 12 and three-month periods, had failed, right?

Witness: Prior to December 2002?

Mr. Zehe: Prior to December 2002.

5

Witness:    Oil Zone did not come back -- yes, it fell through the cracks. (Tr. 275-276)[1]

Notwithstanding the plain record of negligent handling of the Strick matter and having no excuse for the delay, AUTOZONE still grasps at the legal arguments of excuse. When AUTOZONE finally did get around to Michael Strick, it sent a cursory two page form letter which Ms. Clunan admitted would take only 1/2 an hour for one of her many attorneys to draft. In fact, from December 1998 to February 2003, AUTOZONE managed to find time to send out 100 – 200 cease and desist letters similar to the one sent to Michael Strick. (Tr. 213-215, 222, 225-226). At the time, AUTOZONE was using Alan Cooper's former firm, Shaw Pittman, a large Washington D.C. law firm with hundreds of attorneys and substantial resources, which is evident from the testimony of Ms. Clunan that AUTOZONE was willing to and did in fact spend millions of dollars on legal fees from 1998 to 2003 challenging an assortment of marks. *Id.*

The prejudice this delay caused Michael Strick is substantial. He expended over four years and spent over $29,000 establishing good will and growing his small businesses through advertising, promoting and developing a loyal customer base at and around his shops. (Ex. J11; Tr. 251-252, 384-390). Amy Clunan's explanation that it "fell through the cracks" is a woefully inadequate excuse for lack of diligence and cannot be elevated to a legally reasonable cause. This is especially evident where the defense of *laches* has been utilized to bar injunctive relief with periods of delay spanning as short as two or three years. *See New Era Publications International v. Henry Holt & Company, Inc.*, 873 F.2d 576, 584 (2nd Cir. 1989); *see also Fruit Industries v. Bisceglia Bros. Corporation*, 101 F.2d 752, 754-755 (3rd Cir. 1939); *see also Trustees of Columbia University v. Columbia-8C8

---

[1] It is no wonder that OIL ZONE fell through the cracks given that Ms. Clunan's review of pending files for reprioritization consisted of randomly grabbing some files from her cabinets, and then looking them over when she had time, which was not often. (Tr. 236-237)

*Healthcare Corp.*, 964 F.Supp. 733, 751-753 (S.D. N.Y. 1997); *see also McDonald's Corp v. Druck and Gerner, DDS, P.C.*, 814 F.Supp. 1127, 1137 (N.D. NY 1993).[2]

Critically, in this case, AUTOZONE's has neither the facts nor the law on its side. AUTOZONE's cited authority in opposition to the application of *laches* is premised on a party acting *reasonably* or *diligently* in prioritizing objectionable uses. *See, e.g., Matrix Essentials, Inc. v. Karol*, 1992 WL 142292, *3 (ND IL 1992). By AUTOZONE'S own admission, that clearly was not the case here, and AUTOZONE's authority supports the application of *laches* in this case. *See id.* (indicating that negligence by a plaintiff in prioritizing marks supports the application of *laches*).

## II. There is no likelihood of confusion.

In addition to being barred by *laches*, AUTOZONE failed to sustain its burden of proof. The marks at issue are not confusingly similar, and there is no likelihood of confusion. To establish a case for infringement or unfair competition, AUTOZONE must establish that a "likelihood of confusion" exists between the marks or products of the parties. *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc*, 128 F.3d 1111, 1115 (7th Cir. 1997). The Seventh Circuit considers the following seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff. *See id; see also CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 677-78 (7th Cir. 2001).

The likelihood of confusion test is an equitable balancing test. *Barbecue Marx, Inc. v. 551*

---

[2] AUTOZONE alternatively argues that even if *laches* is proven, the 7th Circuit will not apply the doctrine as a matter of law in cases involving a four year and two month delay. This argument misconstrues the very nature of *laches* and its discretionary application by the Court according to the particular facts of each case. There is no bright line test as AUTOZONE would have this Court believe, and AUTOZONE's inexcusable delay coupled with the prejudice caused Mr. Strick warrants the application of the doctrine here.

*Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). "No single factor is dispositive and courts may assign varying weights to each of the factors in different cases . . ." *Id*. However, the Seventh Circuit has noted, "although no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000). To prevail, it is not enough for AUTOZONE to show that "confusion is possible and may even have been desired." *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997). Confusion "must be *likely* in order to enjoin use of the trademark." *Id*. A thorough analysis of this factual inquiry leads to the inevitable conclusion that consumers are not likely to be confused between the marks. AUTOZONE has the burden of proving a likelihood of confusion, and not simply a possibility of confusion. AUTOZONE did not meet its burden at trial.

### A.     *There is no actual confusion.*

The existence of actual confusion in the marketplace is one of the primary factors the Court examines, and indeed, many courts find this to be decisive. *See Eli Lilly & Co.*, 233 F.3d at 462; *see also* 6 McCarthy on Trademarks and Unfair Competition (4th ed.) Sec. 32:195 *Comment: judicial receptiveness to survey evidence – Rising judicial expectations.* It is undisputed that AUTOZONE has no evidence of actual confusion. A company such as AUTOZONE, with relatively inexhaustible resources, presumably has the means to commission a marketing survey to determine consumer perceptions regarding the marks. Dean Rose agreed that surveys were a regular part of a marketing budget that approached $1 billion in this time frame. (Tr. 46-47, 83-84). By not doing so here, AUTOZONE avoided the obvious – consumers would not be confused. In fact, when an AUTOZONE store opened down the street from the Wheaton OIL ZONE in 2000, nothing was reported by employees or customers.

### B.     There is no intent.

The second key factor is that of intent.  The positive evidence on this point is as convincing as the complete lack of evidence on actual confusion.  Michael Strick created his OIL ZONE mark in April 1996. (Tr. 323-326, 338).  He testified that he was unaware of AUTOZONE and had never been to an AUTOZONE store before then. (Tr. 291, 314, 355-356).  The first time he learned of AUTOZONE was when the plaintiff opened a store down the street from his Wheaton OIL ZONE shop in 2000 - four years after he created OIL ZONE.  Likewise, Michael and Paula Strick testified extensively about how and why they created the OIL ZONE mark and how it had nothing to do with AUTOZONE. (Tr. 299, 325-326, 328-329, 339-346, 353-354, 416-419, 420-422; Exs. D1, D7, D45 & J2).  They created the mark after deciding to open a new business and changing names from their prior Oil Express franchise.  They chose the OIL ZONE mark after sketching various versions and deciding which one they liked best.  Their sketches and Michael Strick's journal documenting the creation of OIL ZONE were admitted into evidence.  They chose OIL ZONE and the signage on their Wheaton Store so that they could use lettering from their old Oil Express sign and save costs.  Again, none of their decisions had anything to do with AUTOZONE, and the photographic and documentary evidence depicting the marks as they are seen in the marketplace (in section C below) further highlights this point.

It did not take a trial to prove that Michael Strick is not an attorney.  For an oil change technician, however, Mr. Strick did an impressive job the best way that he knew how to ensure that no other businesses were using the OIL ZONE mark.  He contacted LEXIS and ran a search for active uses with the United States Patent and Trademark Office. (Tr. 347-350; Ex. J3).  The results of that search showed no other uses of OIL ZONE.  Michael then registered OIL ZONE with the Illinois Secretary of State to ensure that no one would use it in the future. (Tr. 350-353; Exs. D10 &

D70).

AUTOZONE argues that Michael Strick must have known about AUTOZONE back in July 1996 because of AUTOZONE's purported, extensive advertising and presence in the Chicago area at that time. AUTOZONE's "evidence" on this issue is sparse and speculative at best. It is stipulated by the parties that AUTOZONE had only two stores in the Chicago area in July 1996 when Michael Strick created OIL ZONE. (Stip. No. 17). Those two stores in Joliet, unknown to the Stricks, were 40 miles from Michael Strick in Wheaton. Defendants' map exhibit D41 underscores AUTOZONE's absence in and around the Chicago area. (Exhibit D41; Tr. 133-139, 141-142). AUTOZONE's minimal presence in a market with over six million consumers completely undercuts AUTOZONE's claim that it was well known and "ubiquitous" in Chicago at that time.

AUTOZONE's argument is further undermined by the testimony of Dean Rose, who testified about AUTOZONE's advertising and presence in Chicago. However, when cross examined by Defense counsel and questioned by the Court, Mr. Rose could not answer any specific questions about the nature and extent of AUTOZONE's advertising in Chicago in 1996. (Tr. 139, 148). Nor could Mr. Rose testify when specific advertisements ran in Chicago or even in what year photographs offered by AUTOZONE at trial to establish its presence in Chicago in 1996 were taken. (Tr. 142-143). If AUTOZONE can't be specific, who can? Leaving evidence this critical to conjecture and speculation is an example of how utterly inadequate AUTZONE's case is.[3]

    ***C.    The marks are dissimilar.***

Whether the marks are similar is the third, key factor. In examining the marks, a comparison should be made under conditions that are likely to appear in the market. Rather than parsing words

---

[3] Finally, even if AUTOZONE advertised in the Chicago area at the time, it does not show that Mr. Strick intentionally copied the AUTOZONE mark. *See Best Vacuum, Inc. v. IAN Design, Inc.*, 2005 WL 1185817 1, *12 (N.D. Ill. 2005).

to detect theoretical distinctions, courts are encouraged to employ a common sense approach and view the mark as a consumer might. *See Meridian*, 128 F.3d at 1115; *see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988). The undisputed evidence shows just how dissimilar the marks appear to consumers. A picture speaks a thousand words, and Michael Strick introduced numerous photographs of the parties' marks, signage and stores all of which show the stark differences between the marks and how they are perceived in the marketplace:

OIL ZONE Wheaton | AUTOZONE Wheaton







OIL ZONE/WASH ZONE Naperville | AUTOZONE Naperville




11




These and the numerous other photographs in group exhibits D43-D50 admitted into evidence illustrate the many differences between the marks, those facts are highlighted.

| | |
|---|---|
| The AUTOZONE has a capital A and a capital Z and is one word.  The letters that follow are small casing.  The letters are on the same plane as A and Z. | OIL ZONE and WASH ZONE are all capitalized and consist of two words.  The letters are all capital casing.  The letters after O and Z are raised. |
| AUTOZONE is red and orange - red in the letters of the words and orange in the vertical stripes. | OIL ZONE is green and WASH ZONE is blue. |
| AUTOZONE has bars of decreasing thickness which either proceed or follows the text. | OIL ZONE and WASH ZONE are sometimes displayed with horizontal bars underneath, through and after the word portions. |
| | WASH sometimes appears directly above the word ZONE in WASH ZONE.  Unlike AUTOZONE. |

The differences in the parties' shops and stores, on which the marks are displayed to the public, are evident as well:

| | |
|---|---|
| AUTOZONE stores are larger, sleek, visually appealing, retail stores. | Michael Strick's two shops are stand alone garage-like structures. |
| AUTOZONE stores are typically painted gray, red and orange. | Michael Strick's shops are made of cinder block and unpainted. |
| AUTOZONE stores have no bays for customers to drive their cars in for servicing or washing. | Michael Strick's facade consist primarily of service bays for customers' cars. |
| AUTOZONE stores have larger parking lots to hold many cars for its customers. | Michael Strick's shops have little parking (only in the rear), and his customers drive |

| | |
|---|---|
| | their cars into the service bays for service. |
| AUTOZONE stores are laid out completely different to allow customers access throughout the store to shop for the many products offered aisle-by-aisle. | Michael Strick's customers are not allowed in the shop except for a small waiting area. He has no aisle or shelving for the sale of products. |

The *numerous* differences in the parties' marks as they appear in the marketplace weigh heavily in favor of Michael Strick, and AUTOZONE has not carried its burden on this factor as well.

### C. The parties' products and services are different.

AUTOZONE's primary business is selling automotive parts to "do-it-yourselfers" who perform their own repairs or maintenance on their autos. Michael Strick, on the other hand, caters to those who do not perform their own maintenance or repairs on their cars but would rather have it done by someone else. AUTOZONE provides no oil changes, car washes, lube service, fuel injector or transmission service or coolant flushes. (Tr. 103-104) Michael Strick only performs those types of services at his two shops. The evidence is undisputed that AUTOZONE sells literally thousands of automotive products, and its stores and operations clearly reflect its retail, as opposed to service approach.[4] (Tr. 365-371). The only "services" AUTOZONE claims to offer include those such as oil reclamation, battery testing and alternator testing. (Tr. 46). However, AUTOZONE does not charge its customers for this and none of its revenues or profits derive from any such "services." (Tr. 94-95). In short, AUTOZONE sells products and Michael Strick provides services. The differences in the

---

[4] In a last ditch attempt to argue that the parties offer similar products and services and consumers would therefore be confused between the marks, AUTOZONE points to testimony by Dean Rose that AUTOZONE competitors Pep Boys and Napa Auto Parts sometimes operate service centers as well as auto parts retail stores. This argument is irrelevant for a number of reasons, not the least of which is that the analogy compares apples to oranges -- Pep Boys and Napa Auto Parts are not depicted in photos, were never mentioned in discovery and AUTOZONE leaves it to complete speculation as to how the retail/service centers (if they exist) appear in relation to the other.

parties' products and services far outweigh any alleged similarities.[5]

### D. The area and manner of concurrent use favors Michael Strick:

Courts may assess "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE*, 267 F.3d at 681. Here, there is little relationship in the use, promotion, distribution or sale of the goods and services between the parties.

| | |
|---|---|
| AUTOZONE advertises primarily on TV. (Tr. 140) | Michael Strick does no TV ads. |
| AUTOZONE advertises with professional sports teams through sponsorships. (Tr. 140) | Michael Strick has no such sponsorships. |
| AUTOZONE advertises primarily on local and national radio. (Tr. 140) | Michael Strick only advertised on local west suburban radio for 10 days in 1996. (Tr. 378) |
| AUTOZONE advertises in newspapers. | Michael Strick only advertised in local papers once. (Tr. 380) |
| Direct mailing is not favored or used extensively by AUTOZONE. (Tr. 140-141) | Michael Strick's primary means of advertising is direct mailing of primarily color coupons to customers within 1 – 3 miles around his shops. (Tr. 376-377) |
| AUTOZONE's main customer is the do-it-yourselfer. (Tr. 78, 103) | Michael Strick's main customer are people who don't want to perform repairs or maintenance themselves. |
| AUTOZONE's customer base is primarily male. (Tr. 79) | Michael Strick's customers include educated professionals and white collar workers and are approximately 60%-70% female. (Tr. 318-320, 335) |

### E. The strength of AUTOZONE's mark.

Uncontested. However, for the purpose of intent, this strength did not exist in the Chicagoland area in 1996.

### F. The degree of care weighs in favor of Michael Strick.

---

[5] Even more insulting than the phantom competitors is AUTOZONE's effort in closing argument to portray OIL ZONE as a "retailer" because auto parts are supplied as attendant to the service.

The knowledge and care consumers exercise in purchasing the products and services can be relevant in determining whether consumers are likely to be confused. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). Dean Rose testified that many of the products offered by AUTOZONE are under $10. As a result, AUTOZONE argues that consumers are more likely to be confused as to the marks and their source or affiliation. This argument is based on the assumption that consumers buying cheap products or services put less thought into the purchase. Regardless of the validity of this assumption, Mr. Rose also testified that many products sold by AUTOZONE are over $10, over $50 and over $100 as well. (Tr. 104-108). In fact, AUTOZONE sells over 200,000 products ranging in price from less than a dollar to over $1,000. *Id*. Similarly, nearly all of the services offered by Michael Strick, with the exception of a $9.99 car wash and a $9 tail light bulb installation, are priced over $10 and can cost well in excess of $100. (Tr. 373-375). AUTOZONE cannot support an argument that Wheaton and Naperville car owners are not particular about their cars.

### *Conclusion*

Based upon the evidence at trial, Defendants respectfully request this Court to enter Judgment in their favor and against Plaintiffs.

/s/Brian C. Cunningham
Brian G. Cunningham, ARDC #6230848
Jeffrey R. Zehe, ARDC #3125616
Attorneys for Defendants
NIELSEN, ZEHE & ANTAS, P.C.
55 West Monroe Street, 18th Floor
Chicago, Illinois 60603
Telephone: 312.322.9900
Facsimile: 312.322.9977
E-mail: bcunningham@nzalaw.com
jzehe@nzalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

James D. Adducci
Marshall L. Blankenship
ADDUCCI, DORF, LEHNER,
  MITCHELL & BLANKENSHIP, P.C.
jadducci@adlmb.com
mblankensip@adlmb.com

Alan S. Cooper
Nancy S. Lapidus
HOWREY LLP
coopera@howrey.com
lapidusn@howrey.com

/s/Brian G. Cunningham