UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AUTOZONE, INC. and AUTOZONE PARTS, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 03 C 8152 ) ) Judge John W. Darrah |
| MICHAEL STRICK, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs AutoZone, Inc. and AutoZone Parts, Inc. (collectively, "AutoZone") brought suit against Defendant Michael Strick, doing business as Oil Zone and Wash Zone, alleging trademark infringement. On November 2 and 3, 2009, a bench trial was held. The trial included the testimony of several witnesses and various exhibits, including depictions of the various trademarks used by the parties and photographs of the interiors and exteriors of the buildings where they are displayed in connection with the products and services sold by the parties, were admitted into evidence. The parties have also submitted proposed findings of fact and conclusions of law as well as written closing arguments.

The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know

the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all of the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of organization and clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

## FINDINGS OF FACT

AutoZone sells a wide variety of automotive products, both at retail stores and online at autozone.com. AutoZone stores also provide some automobile-related services, such as diagnostic testing and battery testing. AutoZone stores also sell motor oil and provide oil reclamation services. Ninety percent of AutoZone's business comes from the general automobile-using public, including "do-it-yourself" ("DIY") customers who perform some level of maintenance and service on their own vehicles. This customer base is primarily male. The remaining ten percent of AutoZone's business involves the sale and delivery of various products to commercial establishments, such as Firestone and Goodyear stores and local automobile repair

facilities. AutoZone stores do not have any service bays for car repairs and do not offer oil change, lube or car wash services.

AutoZone's stores operate under the federally registered mark AUTOZONE. The AUTOZONE mark appears both in color (red) and black-and-white. The A and Z in the mark are capitals and slightly larger than the rest, which are lowercase. The type is sans-serif and slanted to the right. The mark may appear alone or in conjunction with a "SpeedBar Design," which is intended to suggest movement or speed. The SpeedBar Design, which can appear to the left or right of the text, consists of a series of nearly vertical lines, slanted at the same angle as the text, that become increasingly thick as they move away from the text until they merge into a solid bar. AutoZone first began using the mark and the SpeedBar Design in November 1987. The following is an example of how the AUTOZONE mark typically appears:



By 1996, AutoZone had two stores in Joliet, Illinois, and ten other stores in the market area described by AutoZone as the Chicago Area of Dominant Influence, which includes parts of Illinois and Indiana. Beginning in the early 1990s, AutoZone's advertising in the Chicago area included television commercials on Chicago cable stations and national cable network and print adds in magazines. AutoZone intensified its advertising in the Chicago area in the second half of the 1990s. AutoZone sponsored popular local professional sports teams, such as the Chicago White Sox and Chicago Bulls. AutoZone also sponsored the Chicago Cubs.

In June 1996, Strick created the name OIL ZONE. Strick opened an OIL ZONE oil-change service location in Wheaton, Illinois, in July 1996, and opened a second location in Naperville, Illinois, in 1998. Both the Naperville and Wheaton locations provide oil-change service, transmission services, rear differential services and coolant flushes under the trade name OIL ZONE. The Naperville location also offers car washes under the name WASH ZONE. Both the Naperville and Wheaton Oil Zone facilities' store fronts consist of prominent service bays. Strick's primary customer base consists of members of the general public who live within a one-to-three mile radius of the two Oil Zone locations. Strick's customer base is approximately sixty to seventy percent female.

In 1996, when Strick created the OIL ZONE mark, he did not have knowledge of AutoZone. At that time, the nearest AutoZone location to Wheaton and Naperville was approximately forty miles away, in Joliet, Illinois. Prior to selecting the OIL ZONE name for his new business, Strick obtained a search report from Lexis Document Services. The report showed no common name in use. Strick does not have any legal training and did not obtain any advice from an attorney regarding either his Lexis Document search or his decision to select the name Oil Zone. After creating OIL ZONE, Strick registered the name with the Illinois Secretary of State, which issued a certificate of registration on October 3, 1996.

The OIL ZONE and WASH ZONE marks appear in green and blue, respectively. The letters are all capitals with the initial letter of each word being slightly larger than the rest. A horizontal line runs behind the letters from the initial lower side of the O in "Oil" and the W in "Wash." Two more horizontal lines run behind the letters O-N-E in "ZONE." The three lines

are evenly spaced and continue for a short distance to the right of the text. The following are examples of how the OIL ZONE and WASH ZONE marks appear:





In May 2000, AutoZone opened an AutoZone store in Wheaton, Illinois, within 0.8 miles of Strick's Wheaton Oil Zone store. In July 2006, AutoZone opened an AutoZone store in Naperville, Illinois, within 0.3 mile of Strick's Oil Zone/Wash Zone Naperville store.

AutoZone first became aware of Strick's use of OIL ZONE and WASH ZONE in December 1998. AutoZone's counsel sent a cease and desist letter to Strick on February 18, 2003. That letter was AutoZone's first contact with Strick. AutoZone initiated this action on November 14, 2003.

## CONCLUSIONS OF LAW

To prevail on its claims for trademark infringement and unfair competition under §§ 32(1) and 43(a) of the Federal Trademark Act, 15 U.S.C. §§ 1114(1) and 1125(a), AutoZone must show by a preponderance of the evidence: (1) that its AUTOZONE marks are protectable and (2) that Strick's use of the OIL ZONE and WASH ZONE names and marks is likely to cause

confusion among consumers. *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001) (*CAE*). Strick does not contest that the AUTOZONE marks are protectable. Thus, the question is whether there is a likelihood of confusion among consumers.

Seven factors are used to evaluate the likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff. *CAE*, 267 F.3d at 677-78. No single factor is dispositive; different weights may be assigned to each, depending on the facts of the case. *Id.* However, in many cases, three of the factors – the similarity of the marks, the defendant's intent, and actual confusion – are likely to be particularly important. *Id.*

## DECISION

### *Similarity of the Marks*

The most obvious similarity between the OIL ZONE/WASH ZONE and the AUTOZONE marks is that they all contain the word "zone." In all the marks, zone is preceded by a short one or two syllable word. When spoken "oil zone," though not "wash zone," has a similar sound and cadence to "auto zone." Visually, the marks have some further similarity. The initial letters of "Oil," "Wash," "Auto" and "Zone" are larger than the remaining letters in each word. Block letters, slanting slightly to the right are used in all the marks. Finally, all marks use some type of visual design intended to suggest movement or speed.

However, the marks also have significant differences. First among these is color. AUTOZONE is displayed in red. OIL ZONE and WASH ZONE appear in green and blue. The

6

characteristics of the letters themselves differ as well. Both OIL ZONE and WASH ZONE appear in all capitals; in AUTOZONE, only the A and Z are capitalized. Furthermore, in AUTOZONE, the bottom of each letter is at the same level and, when displayed with SpeedBar Design, at the same level as the bottom of that bar. The tops of the A and the Z in AUTOZONE are also on the same plane as the top of the bar. In contrast, the non-initial letters in the OIL ZONE and WASH ZONE marks are neither in line with the tops nor bottoms of the initial capital letters. Rather, the initial capital letter of each word, O, W and Z, are larger such that they extend both above and below the letters that follow. Additionally, while AUTOZONE appears all as one word, both OIL ZONE and WASH ZONE appear as two words, separated by a space.

Finally, while all marks use graphic elements to convey movement or speed, the manner in which they do so is different. AUTOZONE uses essentially vertical lines set to the side of the text. OIL ZONE and WASH ZONE use horizontal lines behind the text with the bottom such line effectively underlining the non-initial letters. Basically the marks are similar in their use of the word "Zone."

Considering all these differences, the marks are only somewhat similar. That similarity is almost entirely due to the word "zone" appearing in all marks. The other similarities argued by AutoZone, such as the use of slanted block letters and the initial letters being larger – due to capitalization or otherwise – do not suggest a degree of uniqueness to attribute similarity to the marks. Rather, due to the significant differences between the marks – the different color, the use of all capital letters, the different graphic elements to convey movement, and the way in which the initial letters extend below and above the letters that follow – the OIL ZONE and WASH ZONE present an appearance that is not significantly similar to the AUTOZONE mark.

7

Furthermore, confusion between the marks is even less likely when the marks are considered in the physical retail context in which they are displayed by the parties and perceived by the consumer. Specifically, the exterior appearance of the Oil Zone facilities significantly diminishes the probability of consumer confusion by associating either location with AutoZone. The Wheaton Oil Zone location is a simple concrete building with a green Oil Zone sign. The Naperville Oil Zone/Wash Zone location is a white building with a blue roof. Neither has an appearance even slightly resembling a typical AutoZone store, which has the standardized, uniform look consistent with a retail store operated as part of a nationwide chain. In contrast, the Oil Zone locations present the appearance of two small, independent businesses, not associated with any national commercial entity.

*Similarity of the Products*

There is a general similarity of the two businesses in that the products and/or services offered by both AutoZone and Strick generally relate to the care and maintenance of automobiles. However, there is a material distinction between the services/products offered by the two businesses. Oil Zone is, first and foremost, an oil-change facility that essentially provides automotive services. AutoZone is a retail store where consumers buy auto parts. While Oil Zone installs new parts in providing automotive service and AutoZone provides some service in conjunction with its part sales, basically the former provides services while the latter sells products.

AutoZone argues that customers may erroneously believe that Oil Zone and Wash Zone are the service-only centers of AutoZone. AutoZone notes that two of its competitors – Pep Boys and Napa Auto Parts – have locations in the Chicago area that offer either only retail parts, only

8

maintenance services, or both retail parts and maintenance services. However, AutoZone's argument is entirely speculative. AutoZone has not produced evidence that it maintains service-only locations and has offered no evidence of any kind of customer confusion to support this assertion.

Therefore, AutoZone has failed to show the products and services offered by the two businesses are so similar as to be likely to lead to confusion.

### *Area and Manner of Concurrent Use*

This factor considers "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE*, 267 F.3d at 681 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). It is undisputed that there is overlap between the geographical markets targeted by the parties. AutoZone has stores within 0.3 and .08 miles of Strick's Naperville and Wheaton stores, respectively. Both cater to the general automotive-using public.

However, there are differences in the customer bases of the two businesses. As found above, approximately sixty-five percent of Strick's customers are women; whereas, only twenty percent of AutoZone customers are women. Furthermore, AutoZone has a very high percentage of DIY customers; in contrast, Strick's facilities provide basic automobile maintenance services (oil change, car wash, etc.) to automobile owners. The AutoZone customer is generally seeking to purchase products for use by the customer in performing maintenance and repair on an automobile. Whereas, the Oil Zone/Wash Zone customer is seeking to purchase both the part and the installation and repair or maintenance service.

Additionally, the physical appearance of the interior of Strick's facilities makes it unlikely that a consumer would believe that they sold auto parts. The Oil Zone facility in Wheaton consists of a simple concrete building just large enough to hold auto-service bays and a small office/waiting area. The Oil Zone Naperville location has four auto-service bays and a car wash. There is no area at either Oil Zone location that contains a large selection of auto parts and related accessories for retail sale. By contrast, the typical AutoZone store is a retail facility with large glass windows but no car bays. The interior contains aisles of shelves, each stocked with automobile parts and accessories.

With respect to use of the marks in advertising, there is no significant concurrent use because the parties use different media to promote their businesses. AutoZone advertises nationally through television, radio, newspapers, and sponsorship of professional teams. Strick does not advertise on television and does not sponsor professional teams. Strick advertised on radio once for ten days in 1996 and has advertised in local newspapers only once. Strick's primary means of advertising is through direct mail, a method not used extensively by AutoZone.

Therefore, this factor weighs heavily against a likelihood of confusion among consumers regarding Strick's and AutoZone's marks.

*Degree of Care Likely to be Exercised by Consumers*

AutoZone argues that customers are likely to exercise a low degree of care because most of the products and services sold by Autozone and Strick are inexpensive. AutoZone notes that it sells many products priced under $10.00 and that Strick charges only $32.99 for an oil change (plus $0.99 for disposal) and between $5.00 and $15.99 for a car wash. This evidence is of little weight, particularly when considering the distinct difference in essentially the sale of services

10

offered by Strick and the sale of products offered by AutoZone. It is unlikely, therefore, that consumers would be confused, even though the prices charged by each business are relatively inexpensive.

Furthermore, AutoZone, in its proposed findings of fact and conclusions of law, states: "Strick's customer base consists largely of individuals who live or work within a three-mile radius of one of its two locations, which suggests that those customers are drawn to Strick's business because they are convenient to customers' homes and offices, **and that these customers would continue to frequent Strick's business regardless of the names used to identify those operations.**" (emphasis added). By conceding that Strick's customers are drawn from a limited surrounding area, familiar with his business and not dependent on Strick's use of any particular mark, AutoZone essentially admits Strick's customers' familiarity with and convenient proximity to his business, thereby rendering the probability of confusion between the marks nil.

### Strength of the AutoZone's Mark

The parties agree that AUTOZONE is a strong mark. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008) (citations omitted). AutoZone's mark is undisputably strong, and this factor weighs in its favor.

### Whether Actual Confusion Exists

AutoZone admits it has no evidence of actual confusion. Evidence of actual confusion is not required to show a likelihood of confusion. *CAE*, 267 F.3d at 685. However, lack of such evidence, especially over an extended period, may indicate lack of actual confusion. *See id.* at

11

686. Here, Strick has been using the OIL ZONE mark for over thirteen years. AutoZone has offered no evidence of any incident of confusion between the use of the marks during this time period, even though AutoZone has operated a store within 0.8 miles of Strick's Wheaton facility since May 2000 and has operated another store within 0.3 miles of Strick's Naperville facility since 2006. Therefore, the absence of actual confusion, particularly when considered in the context of these facts, fails to support AutoZone's claim.

*Strick's Intent*

Strick had not heard of AutoZone at the time he created the OIL ZONE name and mark in 1996. AutoZone argues that Strick knew of AutoZone in 1996, and then he created Oil Zone and Wash Zone to mislead consumers and benefit from AutoZone's goodwill and consumer recognition. AutoZone argues that its advertising presence in Chicago prior to 1996, including advertisements during and at professional sporting events, make Strick's claim of ignorance unlikely. Furthermore, AutoZone identifies several contradictions in Strick's testimony concerning whether he or his wife originally came up with the name and design and whether the OIL ZONE was based on the "Oil Express" logo, previously used by Strick's business.

Strick's testimony on this issue was credible and persuasive. The discrepancies in his testimony identified by AutoZone are immaterial and not indicative of any effort to mislead the Court. Differences in the testimony by Strick and his wife regarding how the OIL ZONE mark was created were minor and more likely the result of over thirteen years having passed since Strick created his business's name. Furthermore, Strick's testimony that he used the name Oil Zone in part because he was able to reuse lettering from the sign on the building of his Wheaton location from a previous business, "Oil Express," was credible and was supported by

12

other evidence. Finally, it is significant that Strick made a good faith effort to determine that he could use the Oil Zone name by performing a Lexis search and registering the name with the Illinois Secretary of State.

AutoZone's evidence that its Chicago-area advertising somehow put Strick on notice when he opened his business is likewise insufficient to impeach Strick's testimony. AutoZone did not provide specific evidence as to what advertising was done in Chicago prior to 1996. Considering the evidence presented, it is reasonable to conclude that Strick created OIL ZONE before AutoZone had fully developed its Chicago advertising campaign. Lastly, as mentioned above, it is undisputed that the two nearest AutoZone stores to Strick at the time he opened the Wheaton facility were forty miles to the south, in Joliet, Illinois, and could not have reasonably provided notice of the AUTOZONE mark.

Therefore, there is no persuasive evidence that Strick intended to "palm off" his business as AutoZone. Rather, the evidence on this issue is strongly to the contrary.

*Weighing of the Seven Factors*

Considering the seven factors discussed above, AutoZone has failed to meet its burden of showing a likelihood of confusion. Of the seven factors, only one – strength of the mark – weighs in favor of AutoZone; and this factor is significantly outweighed by two others – the dissimilarity of the marks and the products and services offered by the parties. As discussed above, apart from the use of the word "zone," there is no persuasive proof of likelihood of confusion between the AUTOZONE and OIL ZONE/WASH ZONE marks. AutoZone has failed to establish by a preponderance of the evidence that Strick's use of the OIL ZONE and WASH ZONE names and marks is likely to cause confusion among consumers.

*Laches*

Strick argues in the alternative that the doctrine of laches bars AutoZone's claims. To establish a defense of laches, Strick must show (1) an unreasonable lack of diligence by AutoZone and (2) prejudice arising therefrom. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) (*Hot Wax*). "For laches to apply in a trademark infringement case, the defendant must show that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, that the plaintiff inexcusably delayed in taking action with respect to the defendant's use, and that the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792-93 (7th Cir. 2002) (internal citations omitted) (*Chattanoga*). Laches is applied on a sliding scale: the longer a plaintiff delays, the less prejudice a defendant must show to prevail on the defense. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 734 (7th Cir. 2003) (*Smith*).

Here, it is undisputed that AutoZone first became aware of Strick's use of OIL ZONE and WASH ZONE in December of 1998. AutoZone made no contact with Strick until it sent a cease and desist letter on February 18, 2003. Thus, it must first be determined whether this delay of just over four years was unreasonable. The Seventh Circuit has instructed the courts should look to "analogous state statutes of limitations to determine whether a presumption of laches should apply." *Chattanoga*, 301 F.3d at 793 (quoting *Hot Wax*, 191 F.3d at 821). Here, that statute is the three-year statute of limitations found in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(e). *See Flentye v. Kathrein*, 485 F. Supp. 2d 903, 916 (N.D. Ill. 2007). Therefore, this statute and AutoZone's four-year delay raise a presumption of unreasonableness.

14

AutoZone argues that the delay was excusable due to AutoZone's other ongoing enforcement actions between 1998 and 2003. During that time, AutoZone argues, AutoZone was involved in twelve infringement actions, fourteen contested registration proceedings before the Trademark Trial and Appeal Board and over one hundred infringing uses of AUTOZONE that were resolved short of litigation.

During the bench trial, extensive evidence was presented regarding AUTOZONE's procedures for reviewing and prioritizing action on reported instances of trademark infringement. Specifically, Amy Clunan, in-house counsel for AutoZone, testified that she would perform an initial review of each case of reported infringement and, if no action was taken immediately, would flag the case to be reviewed again in either three, six or twelve months. Clunan testified that beginning in 1999, she was responsible for making initial recommendations for all trademark infringement actions. Clunan initially testified that the Oil Zone case had been given either a six- or twelve-month review date. However, during cross-examination, Clunan admitted that she was not aware of the Oil Zone case until November or December of 2002, stating that it "fell through the cracks."

It is clear that the actual reason AutoZone did not pursue this case in a reasonably timely manner was not that it was too busy with other enforcement actions but, rather, that for whatever reason, it gave the case file no attention for nearly four years.[1] This does not excuse AutoZone's

---

[1] AutoZone argues that another in-house attorney, not Clunan, made the decision not to take immediate action on this case in December 1998. This factual question is irrelevant to the resolution of this issue since it is undisputed that after the initial review, the Oil Zone case file went unreviewed for four years.

delay. Therefore, AutoZone has not overcome the presumption that its four-year delay was unreasonable.

AutoZone argues that the case law does not require proof of constant prioritization of trademark enforcement actions and that it is enough that they were engaged in other enforcement actions during that time. This argument is unpersuasive. The law requires evidence that would justify AutoZone's four-year delay. Here, it is undisputed that Plaintiffs did not even consider an enforcement action for four years.

The next question is whether Strick has shown prejudice due to AutoZone's inaction. Strick argues that he spent over $29,000 establishing good will through advertising in the four years before AutoZone brought suit. In response, AutoZone contends that Strick has presented no concrete evidence that he has built up good will or customer loyalty over the last four years. However, this evidence is unnecessary. It is undisputed that Strick spent four years and a substantial sum promoting the Oil Zone name. Forcing him to change that name now would obviously cause a loss in terms of both time and money. Thus, Strick has shown that he has been prejudiced by AutoZone's delay.

AutoZone argues that Strick has not shown that he relied on AutoZone's delay and that AutoZone's action induced Strick to adversely change his position. However, under recent Seventh Circuit case law, this is not required. *See Hot Wax, Inc.*, 191 F.3d at 824 (finding prejudice where the defendant "could have invested its time and money in other areas or simply renamed its products" had the plaintiff brought suit sooner); *Chattanoga*, 301 F.3d at 795 (finding prejudice where the defendant had invested significant resources in advertising). Thus, Strick is not required to make any further showing with respect to prejudice.

16

Therefore, AutoZone unreasonably delayed in bringing this suit, and Strick would be prejudiced by allowing AutoZone to now assert its rights. Therefore, the doctrine of laches bars AutoZone's suit.

## CONCLUSION

For the foregoing reasons, Strick's use of the OIL ZONE and WASH ZONE names and marks is not likely to cause confusion among consumers. In the alternative, the doctrine of laches bars AutoZone's suit. Therefore, judgment is granted in favor of Strick.

Dated: March 8, 2010

JOHN W. DARRAH
United States District Court Judge